[No. 672.     October 2, 1897.]

JOHN BOYLE, JR., Appellant, v. MOUNTAIN KEY MINING COMPANY, Appellee.

MINES AND MINING—LIEN—SUPERINTENDENT'S CLAIM—COMP. LAWS, SEC. 1520 — STATUTORY CONSTRUCTION — ENTIRE CONTRACT. — 1. Held: That the superintendent and general manager of a mine, who has merely the management of the mine, and does not actually perform any bodily labor upon or in it, is not entitled to the benefit of section 1520, Compiled Laws, giving to every person performing labor upon or in a mine a lien upon the mine.

ID.—2. Held: That the superintendent's claim, being for a fixed sum for all his services, part of which were not within the scope of the statute, supra, is void in toto.

*Appeal*, from a judgment for defendant, from the Fifth Judicial District Court, Socorro County.    Affirmed.

The facts are stated in the opinion of the court.

WARREN, FERGUSSON & GILLETT for appellant.

The contract was entire it is true, but it included in its terms only such services as were properly in the line of the duties of a superintendent.    Even if he performed other work for the company, that can not affect the construction of the contract itself.    The contract is plain, and contemplates only services which the master rightly finds are entitled to a lien. Capron v. Strout, 11 Nev. 304; Mining Co. v. Cullens, 104 U. S. 176.

Such statutes are to be liberally construed.    Mining Co. v. Strout, supra.    Our statute (Comp. Laws, sec. 1520) is very similar to that of Utah, on which this last decision is based.

JAMES S. FIELDER for appellee.

Statutes authorizing mechanics' liens are in derogation of the common law, and must be strictly construed.    Minor v. Marshall, 6 N. M. 195; Finane v. Hotel & Improvement Co., 3 N. M. 256.    See, also, Davis v. Alvord, 94 U. S. 545.

The provisions of the statute, requiring certain prerequisites to entitle the claimant to a lien, must be strictly complied with; and a failure to comply with one is equally as fatal as a failure to comply with all of these provisions.    Phil. on Mech. Liens, secs. 356, 357; Minor v. Marshall, supra; Lynch v. Cronan, 6 Gray, 531; Davis v. Livingston, 29 Cal. 283; McWilliams v. Allen, 45 Mo. 573; Graves v. Pierce, 53 Id. 428.

Where a non-lien claim is mingled with a lien claim, and there is no way to distinguish the amount of each, it has been held there is no lien.    Phil. on Mech. Liens, sec. 355; Jones v. Walker, 43 N. Y. Sup. Ct. 354.

The general manager of a mine, who occasionally inspects the workings of the mine and gives general instructions

to the foremen is no more entitled to a lien than would be the owner, in whose shoes he stands.   Smallhouse v. Kentucky, etc., Co., 2 Mont. 443; Mining Co. v. Cullin, 104 U. S. 176.

SMITH, C. J. —This action was instituted in the district court for Grant county on the tenth day of December, 1892, by John Boyle, Jr., the complainant, against the Mountain Key Mining Company, a corporation; and other persons, herein designated as "Charles Silva et al.," were also made defendants, they claiming an interest in the Mountain Key Mine, upon which complainant sought by his bill to establish a lien for work and labor performed thereon, as provided by section 1520 et seq. of the Compiled Laws of New Mexico. Prior to the institution of this action, to wit, on the twelfth day of March, 1892, the defendants Charles Silva et al. obtained a decree in a suit which they had formerly instituted against the Mountain Key Mining Company, establishing their claims of lien, respectively, for work and labor performed on the Mountain Key Mine, against the said company and said mine; and on the twelfth day of March, 1892, the said Mountain Key Mine was sold by John M. Ginn, a special master, under said decree, and purchased by Battista Gaudina, one of the defendants herein designated as "Charles Silva et al.," and the deed of the special master upon said sale was approved by the chancellor of the Third judicial district court on the fourteenth day of May, 1892.   Gaudina was in possession of the Mountain Key Mine by virtue of his purchase and deed at the time this suit was instituted by the complainant, John Boyle, Jr.   On the thirteenth day of June, 1893, William Walker and James S. Fielder, having acquired title to the said mine by purchase from Gaudina, intervened as defendants in this cause.   On the thirtieth day of October, 1893, the hearing of this cause was begun before A. H. Harlee, as special master.   On the twenty-eighth day of April, 1894, the special master filed his report in the court below.   Objections were filed by the solicitor for the complainant, and also

by the solicitor for the defendants Charles Silva et al. and the interveners, to the report of the special master, and exceptions to the confirmation of the report by the chancellor. Both were overruled, and the report was confirmed by the chancellor on the first day of December, 1894. The claim of lien which the complainant sought to establish against the Mountain Key Mine is in words and figures as follows:

"Lien Claim. To Whom it May Concern: Notice is hereby given: That I, John Boyle, Jr., have a demand against the Mountain Key Mining Company, a corporation doing business under the laws of the territory of New Mexico, in the sum of five thousand, two hundred and seven dollars (5,207), after deducting all just credits and offsets. That the said indebtedness arose for work and labor done and performed at the times and in the manner, terms and conditions following: That, heretofore, to wit, on the first day of November, A. D. 1888, the said Mountain Key Mining Company, then and there being the owner and in the possession and operation of that certain mine and mining claim known as the 'Mountain Key Mine,' situated in the Pinos Altos mining district, in Grant county, New Mexico, a more full and complete description of which will be found in the deed of the same to said company as the same is recorded in Book of Deeds No. 20, at pages 339 and 340, of the office of the probate clerk and ex officio recorder of said county, to which reference is hereby made, and was also the owner and in the possession and operation of certain machinery, appliances, and improvements situated upon said property, hereinafter described. That on the said date, to wit, the first day of November, A. D. 1888, the said Mountain Key Mining Company employed the undersigned, John Boyle, Jr., to work and labor upon said mine and mining claim for the said company, in the capacity of superintendent. That he should superintend the mining and abstracting of ores, the digging of tunnels, the sinking of shafts, the employment and discharge of other laborers of said company in and about the work and labor performed upon said mining claim, and such other services as were usual and

customary to be done and performed by mining superintend-
ents. That the undersigned should be paid for the work and
labor so done by him the sum of two hundred and fifty dollars
per month for each and every month, payable at the end of
each month. That pursuant to the terms and conditions afore-
said he entered the employ of the Mountain Key Mining Com-
pany, and performed the work and labor to be performed by
him upon said mining claim as aforesaid, from the first day of
November, A. D. 1888, to the first day of September, A. D.
1891, being the period of thirty-four months, at the monthly
wages of two hundred and fifty dollars, a total of eight thou-
sand, five hundred dollars due the undersigned for work and
labor. That the said company has paid to the undersigned on
account of said labor the sum of three thousand, two hundred
and ninety-three dollars (3,293), at various times and in va-
rious amounts, and the balance claimed is the sum of five thou-
sand, two hundred and seven dollars, which now remains due
and unpaid and which the said company has failed and refused
to pay. That the said contract of employment was made by
said company, acting through its president, John Boyle, on or
about the first day of October, A. D. 1888: Now, therefore,
in consideration of the premises, I, the undersigned, John
Boyle, Jr., do hereby claim a lien upon said property known
as the 'Mountain Key Mine,' hereinbefore described, and also
upon the improvements thereon situated, to wit:   One black-
smith shop, and tools thereunto belonging; one ore house; one
set of scales; five dwelling houses; one boarding house; one
assay office; the hoisting plant, consisting of hoisting house,
hoist engine, boiler, pump, derrick, cars, skip, cables, tee rail,
and all other machinery, appliances and improvements used
in the operation of said mining claim, for the said sum of
$5,207, for the work and labor done and performed upon the
said property.   John Boyle, Jr.

"Territory of New Mexico, County of Grant—ss.: John
Boyle, Jr., being first duly sworn, on his oath says that he has
read the foregoing claim of lien, and understands the contents

thereof, and that the facts therein stated he knows of his own knowledge to be true.    John Boyle, Jr.

"Subscribed and sworn to before me this 15th day of September, A. D. 1891.    E. M. Young, Probate Clerk. [Seal.]"

Marginal: "Lien.    J. Boyle, Jr., vs. Mountain Key Mining Company.    Filed for record September 15th, 1891, 2:50 p. m.    A. M. Young, Probate Clerk, by E. Cosgrove, Deputy."

It appears that the lien claim of complainant was filed before that of defendants Silva et al., and it has, by virtue of such recordation, priority in right, if it can be otherwise maintained. "Qui prior est tempore potior est jure," unless the lien be intrinsically defective. The master reports as follows: "It is shown by the evidence that, during the entire period complainant performed said labor under said contract, complainant was general manager and superintendent of the business of the said Mountain Key Mining Company, which consisted of mining in said Mountain Key Mine, and the milling and reduction of ores taken from said mine at a mill owned by said company, situated about two miles from said mine, and in such capacity, besides superintending the operation and development of said mine, superintended the operation of said mill and the treatment and reduction of ores at said mill; superintended the transportation of ores from mine to mill; received the bullion and concentrates from said mill, and shipped the same; kept the books of the company; employed and discharged labor at mine and mill, and paid for such labor; assayed the ores, or pulverized and prospected the same with horn spoon; assisted in cleaning up and retorting the gold; purchased supplies;. managed the boarding house maintained by said company in connection with said mining and milling, in other words, had general management of the affairs of said company." And he further says: "The evidence shows that complainant was a mining engineer; that he kept a plat of the mines, showing the progress of the development work in said mine; that he resided at said mine, visited and personally inspected the same as occasion required; that he at such times

took ore from said mine with view of testing the same; that during his entire service the foremen of said mine were subject to his orders, and worked under his direction." That the complainant was the general agent and superintendent of the Mountain Key Mining Company; that he attended to all their business; that he directed the conduct of the mine, the mill and all the appurtenant operations; that he was the representative of the company, with absolute and plenary power, is indisputably established, and it devolves upon us to determine whether, as such official, he is within the statutes of the territory designated "Liens." Section 1520 of such title declares that: "Every person performing labor upon, or furnishing materials to be used in the construction, alteration or repair of any mining claim, building, wharf, bridge, ditch, flume, tunnel, fence, machinery, railroad, wagon road or aqueduct to create hydraulic power or any other structure or who performs labor in any mining claim has a lien upon the same for the work or labor done or materials furnished by each, respectively, whether done or furnished at the instance of the owner of the building, or other improvement or his agent; and every contractor, sub-contractor, architect, builder or other person having charge of any mining or of the construction, alteration or repair, either in whole or in part, of any building or other improvement, as aforesaid, shall be held to be the agent of the owner, for the purposes of this act." The supreme court of the United States has practically construed this provision in Mining Co. v. Cullins, 104 U. S. 176, as the statute of Utah therein considered is substantially similar. In this case it was decided that a person hired by the owners of a mine in Utah to oversee the miners, and generally to control and direct the working and development of the mine, and who did, in the performance of his duties, some manual labor, was entitled to a lien for the wages due him. Says Mr. Justice Woods, who delivered the opinion of the court: "The finding of the district court makes clear the character of the services rendered by the defendant in error.

*Margin note: MINES: lien: superintendent's claim: Comp. Laws, sec. 1520: statutory construction.*

He was not the general agent of the mining business of the plaintiff in error. That office was filled by Patrick. He was not a contractor. His services were not of a professional character, such as those of a mining engineer. He was the overseer and foreman of the body of miners who performed manual labor upon the mine. He planned and personally superintended and directed the work with a view to develop the mine 'and make it a successful venture. His duties were similar to those of a foreman of a gang of track hands upon a railroad, or of a force of mechanics engaged in building a house. Such duties are very different from those which belong to the general superintendent of a railroad, or the contractor for erecting a house. Their performance may well be called work and labor. They require the personal attention and supervision of the foreman, and occasionally, in an emergency, or for example, it becomes necessary for him to assist with his own hands. They can not be performed without much physical exertion, which, while not so severe as that demanded of the workmen under his control, is nevertheless as really work and labor. Bodily toil, as well as some skill and knowledge in directing the work, is required for their successful performance. We think that the discharge of them may well be called work and labor, and that the district court rightfully declared the person who performed them entitled to a lien under the law of the territory." It is manifest that had the person before the court been either a general agent of the mining business, or a mining engineer, he would have been excluded from the privileges of the statute, as it must be recognized that in the specification of the services rendered by the lien claimant, in contradistinction with those of others of a character more extensive and skillful, it is implied that the latter could not by any construction be embraced within the terms or spirit of the law. It can but be conceded that such inference is immediate and conclusive. In Smallhouse v. Mining Co., 2 Mont. 445, Wade, C. J., in rendering the opinion, observed as follows: "From the nature of the plaintiff's

employment, as averred by himself, it does not appear that he was an architect or laborer, or that he labored directly in the construction of the buildings, etc., but rather that he was employed by the corporation, at a fixed salary, to manage and superintend its affairs at the place named.    Undoubtedly, he had the general oversight of the business of the company, of the workmen employed to labor upon the buildings, etc., and probably kept an account of their time, saw that they performed good service and earned their wages, and at stated times paid them their money, for all of which he rendered an account to the company.    His services were useful and necessary, but they contributed only in an indirect manner to the construction and erection of the buildings.    He stood very much in the situation of an owner directing and managing works of his own.    He was the representative of the corporation, and to the laborers under him he was the corporation, at the place where the labor was performed.    This was not the kind of service that entitles one to a mechanic's lien. This superintendent stands in the place of the corporation, and to give him a lien for the kind of labor he performed might defeat the liens of the workmen and materialmen who actually constructed the building, and would be like giving a lien to the corporation itself."    In Railway Co. v. Baker, 14 Kan. 563, Brewer, J., declares clerks, timekeepers, superintendents, and that kind of employees, are not within the scope of an act to protect laborers, mechanics and others in the construction of railroads.    He says:    "Doubtless this term ["laborers"] is often used in an enlarged sense, as embracing all persons who perform any kind of labor, physical or mental.    In that sense, any professional or literary man is a laborer; and in that sense Baker, as 'timekeeper' and 'superintendent,' was a laborer.    But it is very apparent it was not used in any such sense here.    If it were, the succeeding term of description, 'mechanics,' would be superfluous; for a mechanic is, in that sense, unquestionably, a laborer.    Indeed, the terms of description associated with this clearly indicate its meaning. 'Noscitur a sociis.'    These show that it is here used in its more

common acceptation, and in accordance with the definition as
given by Webster, as follows: 'Laborer.   One who labors
in a toilsome occupation; a man who does work that requires
little skill, as distinguished from an artisan; sometimes called
a laboring man.' "   That our statute imports the physical sig-
nification of labor is conclusively established by the connec-
tion in which it is employed.   Its terms are, "Every person
performing labor upon or furnishing materials to be used in
the construction, alteration or repair of any mining claim,
building, wharf, bridge, ditch, flume, tunnel, fence, ma-
chinery, railroad, wagon road or aqueduct to create hydraulic
power, or any other structure, or who performs labor in any
mining claim, has a lien upon the same for the work or labor
done."   The enumeration in this section includes some subject
upon which no work not exclusively manual could be per-
formed, and, ex vi termini, excludes any construction of
"labor" not interpreting it in its usual acceptation.   The work
or labor must be ejusdem generis as to all the structures.

In Railroad Co. v. Leuffer, 84 Pa. St. 171, it is declared
that a civil engineer is not a laborer or workman, within the
meaning of the acts giving to contractors, laborers, and work-
men liens upon the property of railroads for the value of
services rendered in the construction.   Mr. Justice Gordon
says:   "Whether the plaintiff can maintain his claim against
the defendant depends upon whether he can bring himself
within the class designated in the statute as 'laborers and
workmen.'   We are, then, to inquire what the legislature in-
tended by the use of these words.   In seeking for this legis-
lative intent, we must give the language of the statute its
common and ordinary signification.   But ordinarily these
words can not be understood as embracing persons engaged in
the learned professions, but rather such as gain their liveli-
hood by manual toil.   When we speak of the laboring or
working classes, we certainly do not intend to include therein
persons, like civil engineers, the value of whose services rests
rather in their scientific than in their physical ability.   We
thereby intend those who are engaged, not in head, but in

hand work, and who depend upon such hand work for their living." The justice proceeds, after citing various authorities, as follows: "We can not doubt but that the terms 'laborers' and 'workmen' were intended to include such only as were engaged in manual occupations. Thus we may see that in these, as in many other cases which we might cite, this limited sense has been given to the words 'laborers,' 'workmen,' 'servants,' and the like; and this for the very obvious reason that in all statutes of this kind the intent has been to protect a class of persons who are wholly dependent upon their manual toil for subsistence, and who can not protect themselves. This same result was reached in the very recent case of Wentroth's Appeal, 82 Pa. St. 469, in the construction of the act of April 9, 1872, per Mr. Justice Sharswood. It is true, in one sense the engineer is a laborer; but so is the lawyer and doctor, the banker and corporation officer, yet no statistician has ever been known to include these among the laboring classes. We can not, therefore, even to save a meritorious claim, undertake to make a new classification which must necessarily defeat the statutory intent."

That the complainant was interested as an investor in the Mountain Key Mine seems palpable, and that he was the agent of the company, empowered to employ and discharge the laborers in all the branches of the business, is admitted, and it does not seem legitimate that there should at the same time be combined in him the position to secure for himself preference over the subordinate chosen by him. In England v. Piano Co., 41 N. J. Eq. 470, 4 Atl. 307, it is adjudicated that the president of a manufacturing corporation is not entitled to the lien given to laborers in the employ of an insolvent corporation for what he earns while serving the company as president. Says Bird, V. C.: "The spirit of the act is manifestly to pay 'laborers,' doing labor or service of whatever character for, or as workmen or employees in the regular employ of such corporation, and not to give a preference to the individual members of the corporation; and not that they may employ themselves, and maintain both attitudes, employer or employee,

as their individual gain and the loss of creditors may dictate. And, as to the public policy of so extending the construction as is urged, let it be considered how strong the inducement, as well as how convenient, for every director to be employed 'doing labor or service as a workman or employee' for his company; and let it also be considered what a prolific source of injustice and fraud such construction would prove to be. There are numerous considerations in this direction which will arise to the mind of the thoughtful." In Blakey v. Blakey, 27 Mo. 39, it is held that a superintendent can have no lien for services rendered in superintending his own workmen, and the court comments as follows: "The law gives the mechanic, builder, artisan, workman, laborer or other person who may do or perform any work upon or furnish materials for any building a lien on the same, to secure the payment of the work done or materials furnished; but it has no such elastic power as is claimed for it in this case, and it can not be stretched to cover, besides the value of the work done and materials furnished, a claim for services performed by the builder for himself in superintending his own workmen." In Raeder v. Bensberg, 6 Mo. App. 445, it is declared that an architect has no lien for his services in drawing plans and specifications and giving general directions to the builder under whose special superintendence the building was erected. Says Bakewell, J., who delivered the opinion of the court: "Plaintiff's claim is for services rendered, not in a mechanical capacity, but purely as an architect. We are of opinion that the mechanic's lien law was not intended to extend to such services. A mechanic who acts as an overseer whilst performing manual labor does not lose the lien given him for his mechanical services because he also acts as an overseer; but an architect is not a mechanic, nor ejusdem generis, and his services in drawing plans and specifications and giving directions to the builder under whose special superintendence the house is being erected can not be called, in any proper sense of the word, 'work or labor upon the building.'" In Nelson v. Withrow, 14 Mo. App. 276, Thompson, J., says: "The contract, when put in evi-

dence, discloses the fact that the item was not alone for carpenter work, for which the law gives a lien, but that it was also for superintending, for which the law gives no lien." In Murphy v. Murphy, 22 Mo. App. 22, Thompson, J., declares: "The law gives no lien against a building for superintending the construction thereof." The New York statute gives the lien to "any person who shall perform any labor in building any house," etc. It is held that these words do not give a lien to one who, as an architect, superintends the erection of a house. Stryker v. Cassidy, 10 Hun. 18. In Kentucky it is held that the architect or superintendent of a building has no lien, the character of his services not being such as is embraced within the provisions of the statute giving liens to mechanics, laborers and materialmen. Foushee v. Grigsby, 12 Bush. 76.

It seems demonstrated by the foregoing adjudications, the general principles they enunciate, and the specific conclusions they announce, that the plaintiff in error, "general manager and superintendent of the Mountain Key Mining Company," a "mining engineer," who never performed any bodily toil, but directed all the operations of his company, who was the representative and practically the company at its place of business, was employed for his professional knowledge and executive capacity, and not for his strength and fitness to work, and is not, therefore, within the beneficence of the statute enacted, it is claimed, for the security of a class presumably not otherwise able to protect themselves. If not absolutely a part of the company, as a member, he was its authorized agent to act for it in every capacity essential to the development of its property and the realization of profits; and to permit him to utilize his position to procure a preference over the laborers he employed and controlled would frustrate the object of the statute, and promote oppressive injustice. It may be further observed that the compensation agreed to be paid to the superintendent suggests conclusively that he was engaged for his supposed scientific qualifications to supervise and direct a mining enterprise, and not for his worth as a hand upon or in a mining claim. Three thousand dollars per annum is an

excessive consideration for any service, if limited to the over-
seeing of a few laborers in a small mine.   It appears, in the
lien filed, that he was employed to work and labor upon the
mine and mining claim, not manually, but in the capacity of
superintendent, and for such other services as were usual and
customary to be done, not by miners, but by mining superin-
tendents.    It is not necessary to determine whether there is
any distinction between a mining superintendent and the su-
perintendent of a mine, but it is not difficult to conceive that
the one is more comprehensive than the other, that the one
indicates the possession of the qualifications, by education, to
direct all the operations of mining business, and the other
fitness, by experience, it may be, for conducting the develop-
ment of a mine only.   It is not strained to consider one the
superintendent for a mining company, and the other superin-
tendent of a company's mine only.   A railroad superintendent
is the superintendent for a railroad company of the entire line,
and the superintendent of a division is the subordinate in
charge of a portion of the line.

We might with propriety forbear the consideration of any
other proposition in the premises, as we deem the foregoing
position decisive; but we will briefly supplement it by passing
upon the contract, whether it is entire or sev-
erable.   That the plaintiff in error superin-
tended the mine, the mill, the boarding house;
that he employed and discharged the laborers;
that for this "work and labor so done by him" he was promised
the sum of $250 per month, is distinctly alleged by him; and
that attention to the mill, the boarding house, and the laborers
was not the addition of labor to the mine will not, it is pre-
sumed, be contended.   In Barnard's Adm'r v. McKenzie, 4
Colo. 251, it is declared that the statute contemplates a lien
only for such labor as may have been performed in the devel-
opment and improvement of the mine—which has been incor-
porated with it and constitutes a part of its value.   Says
Elbert, J.: "The lien provided for by section 4 [substanti-
ally the same as our statute], above quoted, is for work and

ENTIRE contract.

labor 'in or upon any mine, lode or deposit,' and for materials furnished 'to be used in or about any mine, lode or deposit.' This language fixes clearly the relation which the work and labor must sustain to the property sought to be charged. It contemplates only such labor or material as has been performed and furnished in the development, improvement, or conservation of the mine, which has become incorporated with the mine and constitutes a part of its value. To give a lien for work or labor not performed, in the language of the section, 'in or upon the mine,' would not be construction, but judicial legislation." The services were rendered under one contract for a specific salary, and it is impracticable to make any apportionment upon the basis of a quantum meruit. No allotment of the amount due can be applied to the respective occupations. "If the consideration to be paid is single and entire, the contract must be held to be entire, although the subject of the contract may consist of several distinct and wholly independent items." 2 Pars. Cont., p. 519. It is well settled that a lien account which so mingles items for which the law gives no lien with those for which a lien may be had that they can not be separated upon a mere inspection is void. In Baker v. Fessenden, 71 Me. 292, the court says: "Thus, if the plaintiff might legally have had a lien for a portion of his labor, he has so intermixed and interwoven it with that for which he has shown none that it is utterly impossible for the court, and probably for the parties, to make any such distinction between the two kinds as to authorize a lien judgment for any definite amount." In Edgar v. Salisbury, 17 Mo. 271, it is decided: "Where, in a demand filed by a person seeking to avail himself of the benefit of the act concerning mechanic's liens, services for which he might have a lien are combined with other charges, for which no lien is given, and the whole summed up in one item so that it is impossible to ascertain from the account filed how much of the gross charge is a lien, the party will lose the whole benefit of the act." In Nelson v. Withrow, 14 Mo. App. 270, it is declared that "an account filed as the foundation of a mechanic's lien, which contains a

lumping charge, including an item for which no lien is given, will not support a lien." Says Thompson, J.: "The reason of this ruling is that the owner of the building has the right to know, from the account filed, the amount which, under the law, has become a charge upon the property, in order that by paying or tendering this amount he may discharge the property of the incumbrance." In Mining Co. v. Smith, 1 Or 171, it is declared that "claims for anything but labor and materials are evidently non-lienable, and can not, therefore, be embraced in a judgment for a lien." In Adler v. Exposition Co. (Ill. Sup.) 18 N. E. 811, Craig, C. J., states: "The entire sum named—the $5,000—is to be paid for the entire amount of labor to be performed under the contract. The result is, as an entire contract, it can not be enforced in this proceeding, for the reason that no lien is given for a part of the labor to be performed under the contract. On the other hand, the contract can not be enforced as to that part of the labor performed for which a lien is conferred by the statute, because the contract is entire, and an entire contract can not be apportioned, and the performance of it enforced in fragments." Crosby v. Loop, 14 Ill. 330. That the superintendence of the mill and boarding house was part of the consideration for the $250 promised the plaintiff in error for his services is forcibly indicated by the admission, sworn to by him, that his salary was increased after the said establishments were put in operation. For additional responsibility, and enlarged demands upon his time and skill, it was legitimate that he should require an advance in his allowance. It is not without significance that the plaintiff failed to specify in his "lien claim" the services performed under the provision for "such other services as were usual and customary to be done by mining superintendents;" but it is immaterial whether the omission proceeded from an appreciation of the consequence of such detail, or from inability to make an apportionment. The claim is for a fixed sum for all his services, and, being in part, at least, for such as are not within the scope of the statute, is void in toto.

A few observations upon the origin and object of the mechanic's lien statutes may not be inappropriate.   Writers recognized as standard  and respected tribunals, including the supreme court of the United States, have declared that such enactments were induced by the consideration that the value of the property to which the labor and materials have been applied has been enhanced; that, the labor and materials being incorporated in the structures, the land thus improved should be subject to an equity in favor of those who furnished them. Says Mr. Justice Field in Davis v. Alford, 94 U. S. 547: "The statute was designed to give security to those who, by their labor, skill and materials, add value to property, by a pledge of the interest of their employer for their payment." We respectfully submit that mechanics are not more entitled to protection than other laborers who by their toil augment the value of property upon which they work, and it is not presumable that the lawmaking powers have discriminated in their favor from any partiality for them. We suggest that the policy in favor of mechanics in the United States was conceived and adopted to stimulate the construction of towns and cities, and that the system has been extended, commensurately with the growth of the country, to promote its prosperity in the development of its mineral resources.   The first mechanic's lien act was passed in 1791, by the general assembly of Maryland, at the solicitation of a commission of which Thomas Jefferson and James Madison were members, and was induced by the desire to encourage the rapid building up of the city of Washington as the permanent seat of government.   And it seems logical and fair to believe that similar inducement would have been extended, as far as practicable, to agricultural and other employees, had it been either essential or contributive to the interests of the public and the progress of the country.   We present this view as it seems to contain an explanation which is a complete vindication of the legislation in question.   The judgment of the lower court is hereby affirmed.

Collier and Laughlin, JJ., concur.